UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ERIC AND DEBORAH EBERTS,

    Plaintiffs,

 v.                Case No. 05-C-527

TORGE AND SVETLANA GODERSTAD and
NATIONAL PLASTIC TRADING CO., INC.,

    Defendants.

**DECISION AND ORDER**

  This case is presently before me upon the defendants' motions for judgment on the pleadings and summary judgment.[1] The defendants assert that most of the plaintiffs' claims are barred by the economic loss doctrine, and they further assert that none of the claims have any relationship with defendant National Plastic Trading Company ("National Plastic"). In response, the plaintiffs assert that this court should delay reaching the economic loss issue because the state supreme court has recently granted certiorari on a case raising a similar issue. They further claim that National Plastic was indeed liable for the claims against it because the individual defendants intermingled their assets with the company and controlled all of its assets. In the alternative, plaintiffs have filed their own motion seeking leave to file an amended complaint alleging a claim of "piercing the corporate veil" against National Plastic.

  The facts underlying this case were set forth in this court's previous decision addressing insurance coverage. In short, the plaintiffs purchased a house from defendants Torge and Svetlana

---

[1] The motions have been filed by defendant National Plastic and have been joined by defendants Torge and Svetlana Goderstad.

Goderstad and allege that the defendants failed to disclose known defects in the home's construction. According to the amended complaint, the Goderstads told the plaintiffs they had spent more than $2 million renovating the house and suggested that the house was generally in excellent condition. The plaintiffs, however, have had to pay for costly repairs due to significant damage and maintenance issues that were not disclosed during negotiations. The amended complaint brought claims for breach of contract, misrepresentation and negligence, all based on statements or omissions made by the Goderstads in the course of selling their home to the Eberts.

**I. Corporate Liability, Veil Piercing and Amendment of the Complaint**

The defendants' present motions seek dismissal of claims against National Plastic, a company owned by the Goderstads, on the grounds that National Plastic had no involvement in the sale of the Goderstads' home. According to the defendants, although National Plastic is indeed owned by the Goderstads, the Goderstads were acting in their individual (i.e., non-corporate) capacities when they sold their house. The plaintiffs respond by noting that the Goderstads do not just own National Plastic in the sense that many individuals own stock in IBM or General Electric – instead, Mr. Goderstad is the president of National Plastic and he and his wife constitute the company's board of directors. The plaintiffs allege that they have routinely commingled assets, failed to observe corporate formalities, and essentially are one in the same as their company. In fact, plaintiffs note, the company's assets were used for more than $200,000 of the house's renovation project in 1997.

Even accepting the plaintiffs' assertions at face value, their analysis is off the mark. The question of whether a corporation became the alter ego of its owners – through commingling assets and the like – is a question touching on corporate form rather than the issue of *liability* for misrepresentation or breach of contract. For example, even if the Goderstads did become the alter

2

ego of their company, that does not mean that all of their actions are imputed to the corporation: if they get in a car accident, for example, the accident does not become a *corporate* act merely because of how the Goderstads kept their company's books. As discussed below, when a corporation is the alter ego of its owners, it merely means the corporate form may be disregarded (pierced) and the *owners* may become liable for the corporation's acts. It does not mean the converse, i.e., that the corporation is automatically liable for all of its owners' individual torts.

Instead, to impose liability on the corporation, the plaintiffs must show that the Goderstads were acting in their role as corporate officers rather than merely individuals who happened to own a corporation, and it seems clear that the latter is true. *First Wis. Bank of Oshkosh v. Winnebago Racquet Club,* 120 Wis.2d 681, 357 N.W.2d 565 (Wis. Ct. App. 1984). All indications suggest that the Eberts were buying a house in a standard real estate transaction – they were not relying on the defendants' expertise in plastics or anything remotely related to their business. Indeed, for all the plaintiffs cared, the defendants could have been airline pilots or software entrepreneurs; the fact that they may have owned a plastics business was simply happenstance that had no bearing on the transaction at all. The fact that National Plastic may have written certain checks to fund the home renovation project ten years ago does not mean that the Goderstads were acting as the company's agents when they sold the house. There is thus no basis to impose direct liability on the company for the acts or omissions of its owners.[2]

---

[2] For unexplained reasons, the parties devote substantial attention to the question of corporate liability, as though the Goderstads' ownership of their own company is some sort of novelty. The fact, of course, is that millions of Americans own their own businesses, and many of these are run as sole proprietorships, corporations or LLCs – entities not unlike National Plastics. Yet it is presumably the rare case where the plaintiff in a commonplace real estate transaction seeks to involve a company that only happened to be owned by the defendants.

3

The plaintiffs seem to recognize that National Plastic was not directly liable for the claims alleged in the amended complaint, and in response to the defendants' motion they have filed their own motion seeking leave to amend their complaint to add a claim they call "piercing the corporate veil." Under this theory, the proposed amendment would render National Plastics liable as the alter ego of the Goderstads. Several reasons justify denial of the plaintiff's motion to amend. First, it is doubtful that "piercing the corporate veil" is even a discrete cause of action that would warrant an amendment to the complaint. As discussed below, veil piercing is an equitable *remedy* rather than a claim in its own right. There is nothing inherently nefarious about commingling assets, for example, and the plaintiffs have not been injured by the method in which the Goderstads treat their own business. Though in the right circumstances the veil piercing remedy may be employed to undo or look past corporate formalities, that is only assuming success on some *other* independent claim that has injured the plaintiffs (e.g., breach of contract). *United States v. All Meat and Poultry Products Stored at Lagrou Cold Storage,* 470 F.Supp.2d 823, 833 (N.D. Ill. 2007) ("The defendants contend that 'piercing the corporate veil' and 'direct participant liability' are not causes of action, but rather are means by which a plaintiff may hold a defendant liable for the conduct of another defendant. The court agrees. Courts have long held that, under Illinois law, piercing the corporate veil is an equitable remedy, not a cause of action.")

Putting that objection aside, piercing the corporate veil has little application in the context of this case. Piercing the veil is a means of looking past the corporate entity to the assets of the individual shareholders, yet the plaintiffs appear to want to do just the opposite. That is, piercing the corporate veil is an effort to get *around* the corporate form – typically when the corporation is just a shell or has insufficient assets to pay a judgment – not a means to get *to* the corporation itself.

4

Notably, the Goderstads are not hiding behind any corporate entity to shield their assets – in fact, their motion asserts that their corporation has nothing whatsoever to do with the transaction at issue in this lawsuit. Thus, it seems the plaintiffs are attempting to *create* a corporate veil rather than *pierce* one.

It is true that in rare instances the veil piercing remedy may be applied in reverse. *Olen v. Phelps,* 200 Wis.2d 155, 163, 546 N.W.2d 176 (Wis. Ct. App. 1996). In *Olen,* the individual defendant had fraudulently transferred title to a building to a corporation in order to shield his personal assets from collection proceedings, and the court applied the alter ego doctrine in reverse to allow collection from the corporation. *Id.* A case from this district has also applied the "reverse alter ego" doctrine:

> The [alter ego] remedy is equally available to hold the corporation liable for debts of the controlling shareholders where the shareholders have formed or used the corporation to hide assets and thus avoid preexisting personal liability. Where a creditor proves that controlling shareholders organized or used the corporation to deceive or defraud personal creditors, the separate existence will be disregarded and the corporation and the shareholders will be treated as one and the same. Once a sufficient showing has been made that the corporation is the alter ego of the debtor, the corporation is treated as the debtor and its property may be attached to insure that the final judgment will be satisfied should the creditor ultimately prevail.

*Select Creations, Inc. v. Paliafito America, Inc.,* 852 F.Supp. 740, 774 (E. D. Wis. 1994) (quoting 1 Fletcher Cyclopedia Corporations § 41.70 at 707 (1990)).

Although the doctrine may indeed be applied in reverse, the plaintiffs' proposed amended complaint does not support its application in this case under any of the principles cited above. The proposed amended complaint merely asserts that the Goderstads commingled assets and are the alter ego of National Plastics. These are commonplace reasons to pierce the veil of the *corporation,* for example, in the typical case where the corporation is judgment proof and the plaintiff seeks to recover from its owners. But the amended complaint does not assert any basis to apply the doctrine

5

in reverse, i.e., to look beyond the individual owners of the corporation, the actual defendants alleged to have breached the contract and committed torts. There is no indication that the Goderstads created National Plastics to hide assets or to deceive the plaintiffs. As noted earlier, the fact that the Goderstads sold the Eberts a house and also own a corporation have nothing to do with one another, even if corporate assets may have been commingled with their own. In short, these facts suggest nothing of the fraudulent or inequitable conduct required to allow for reverse veil piercing.

Just as important, perhaps, is that the exotic theory of reverse veil piercing is simply unnecessary. The plaintiffs' apparent motivation is a fear that the Goderstads will themselves be judgment proof if all their assets are tied up in National Plastic. Yet if the concern is that the shareholders will attempt to hide their assets behind the "veil" of a corporation they own, then a judgment against the individual shareholders may solve the problem by requiring them to transfer their ownership of that very corporation to their creditors or liquidate the corporation's assets in some other way in order to pay the judgment. The fact that the corporation may be closely held does not somehow insulate the defendants's assets and render them judgment proof – a judgment against the Goderstads may require them to tap into their corporate stock just as if they had invested solely in blue chips or mutual funds. *Scholes v. Lehmann,* 56 F.3d 750, 758 (7th Cir. 1995) (noting that reverse veil piercing "is a rarity because a simple transfer of the indebted shareholder's stock to his creditors will usually give them all they could get from seizing the assets directly.") Because a judgment against the Goderstads could be satisfied out of National Plastics regardless of any veil piercing theories, the remedy is inapplicable to the facts before me. Thus, the motion to dismiss claims against National Plastics will be granted and the motion to amend the complaint will be denied.

6

**II. Economic Loss Doctrine**

The defendants also seek dismissal, on the merits, of claims II, III, IV, V, VI and VII, all of which allege misrepresentation and negligence theories of liability.[3] The defendants assert that the existence of contractual liability – via the home's purchase agreement – bars the plaintiffs from attempting to seek relief against them under tort theories of liability.

In *Below v. Norton,* the Wisconsin Court of Appeals applied the economic loss doctrine to a residential real estate transaction, noting that "the economic loss doctrine is intended to bar purely economic losses in situations when the relationship between the two parties involves a contract for a product." 2007 WI App 9, ¶ 15, 297 Wis. 2d 781, 789, 728 N.W. 2d 156 (Wis. Ct. App. 2006). Although no Wisconsin cases had applied the economic loss doctrine to a residential real estate transaction before, the court viewed the recent trend as moving in that direction and had little difficulty applying the doctrine in that context:

> If, as Below alleges, the Nortons knew of the defective sewer line and failed to disclose that information as required by statute, then they have breached the terms of the property condition contract and Below has a breach of contract action against them for which contractual remedies would be available. With the statutory protections afforded by § 709.02, the residential purchaser is protected by contract and, therefore, the economic loss doctrine should apply when the only damages sought are purely economic. Such is the case here.

*Id.* at ¶ 17, 297 Wis.2d at 790, 728 N.W.2d at 160.

Plaintiffs concede that *Below* would doom their case, but ask that this court postpone ruling on the question because the state supreme court has granted certiorari in *Below*. Oral argument appears to be scheduled for February, and a ruling can thus be expected within several months, by the end of June at the latest. The parties do not provide any authority suggesting that a stay would

---

[3] Claim VII has already been dismissed, but the defendants note that the matter is currently on appeal and thus suggest an additional basis for dismissal.

not be warranted under these facts. Stay of proceedings is within the discretion of a district court and falls within the court's general authority to control its own docket. Moreover, questions of comity and efficiency come into play. It is one thing for a federal court to rely on the holding of an intermediate state court when determining state law – a fairly typical practice – but it is something more intrusive to rely on an intermediate ruling once the state court system has indicated its desire to examine the matter more fully. Even if *Below* is not reversed outright, the state supreme court may impose considerations or adopt analyses not present in the appellate court's decision. As the First Circuit has put it:

> It may well be that due deference to the ruling in *Erie R. Co. v. Tompkins*, as expanded and applied in subsequent decisions of the Supreme Court, would sometimes make it appropriate for a federal district court to stay proceedings based on diversity of citizenship. Thus, suppose A sues B in a federal district court for damages on account of invasion of an asserted right of privacy. Suppose, further, that a suit between C and D is then pending in the state supreme court upon appeal from a judgment of an intermediate state appellate court in which it was held that such a cause of action could be maintained under state law. In this situation, unless the federal district court grants a stay, it would have to accept the state law as declared by the intermediate state appellate court, rule that the complaint stated a cause of action, and proceed with the trial on that basis. Yet, if the plaintiff A should obtain a verdict and judgment, and appeal therefrom were taken to the Circuit Court of Appeals, that court would be obliged to reverse the judgment if, while such appeal were pending, the supreme court of the state should hand down its decision in the suit of C against D and rule that, by the common law of the state, no right of privacy exists as a legally protected.

*In re President and Fellows of Harvard College,* 149 F.2d 69, 72-73 (1st Cir. 1945) (citations omitted).

Because the defendants' motions rely on the efficacy of *Below*, this court will withhold ruling on their motions for summary judgment until the state supreme court has rendered its decision. But since plaintiffs' have also asserted a claim for breach of contract (warranty), it appears clear that the supreme court's ruling in *Below* will not be completely dispositive. It will

8

therefore be necessary to set this matter for trial in any event. Rather than await the state supreme court's decision, the court will proceed to schedule this matter for trial sufficiently far in advance so that both the parties and the court will have the benefit of the supreme court's ruling.

## III. Conclusion

The defendants' motions for summary judgment and judgment on the pleadings are **GRANTED** in part, to the extent that all claims against defendant National Plastic Trading Company are **DISMISSED**. The motion for leave to file an amended complaint is **DENIED**. The plaintiffs are directed to notify this court when the Wisconsin Supreme Court has issued its decision in *Below v. Norton*. In the meantime, the clerk shall set this matter on the court's calendar for a Rule 16 telephone conference so that the matter can be set for trial and a final pretrial conference.

Dated this   9th   day of January, 2008.

                                         s/ William C. Griesbach
                                         William C. Griesbach
                                         United States District Judge